**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **In re:**<br><br>**407 SMILEY CROSSING LLC,**<br><br>**Debtor** | **Chapter 11**<br>**Case No. 25-12486-JEB** |

# MEMORANDUM OF DECISION

This matter came before the Court on the *Motion filed by Creditor Newburyport Five Cents Savings Bank for Relief from Stay Re: 407-411 Washington Street, Boston, Massachusetts* ("Motion") filed by Newburyport Five Cents Savings Bank ("Lender"). Pursuant to the Motion, the Lender seeks relief from the automatic stay to exercise its rights as a secured creditor with respect to the Debtor's real property located at 407-411 Washington Street, Boston, Massachusetts (the "Property"). The Court held an evidentiary hearing on the issue of valuation of the Property for purposes of the Motion and a plan of reorganization.

For the reasons set forth below, the Court finds that the Property has a fair market value of $13,300,000, and a liquidation value of $10,000,000. By separate order, the Court has set the Motion for further hearing on the remaining issues.

This Memorandum of Decision constitutes the findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a), made applicable to this proceeding by Fed. R. Bankr. P. 7052. The findings set forth in this Memorandum are based on the record as a whole and may be supported by testimony and exhibits that are not specifically cited. Any finding of fact deemed a conclusion of law is adopted as such, and vice versa.

**JURISDICTION**

The Court has jurisdiction regarding this contested matter. Under Section 1334(b) of title 28, the district courts have jurisdiction of "all civil proceedings arising under title 11, or arising in or related to cases under title 11," subject to exceptions not applicable here. 28 U.S.C. § 1334(b). By a standing order of reference in accordance with Section 157(a) of title 28, the district court in this district has referred all cases under title 11 and any proceedings arising under, arising in, or related to cases under title 11, to the bankruptcy court. *See* 28 U.S.C. § 157(a). Motions to terminate, annul or modify the automatic stay are core proceedings in bankruptcy. 28 U.S.C. § 157(b)(2)(G). Accordingly, this Court may hear and finally determine these matters.

**OVERVIEW AND BACKGROUND**

The Debtor is a single asset real estate debtor that commenced this bankruptcy proceeding on November 17, 2025. The Debtor's principal asset is the Property, a mixed-use building located in Downtown Crossing. The Property was built in 1925 and substantially renovated in 2015. The basement and first three floors are leased by the Debtor to The Gap, Inc., for retail sales, online fulfillment, and storage. Floors four through seven contain 11 fully leased residential apartments totaling 9,315 square feet. This includes three one-bedroom units totaling 2,025 total square feet, four two-bedroom units totaling 3,040 square feet, three three-bedroom units totaling 2,700 square feet, and one four-bedroom unit totaling 1,550 square feet. The residential leases are yearly leases, with terms that ended as of August 2026, subject to renewal.

The Debtor's predecessor entered into the lease with The Gap in 2014 for 9,636 square feet of space. The Gap lease was for an initial term of ten years, with options for renewals by The Gap. As of October 2024, the annual rent under The Gap lease was $811,761, with a

renewal rate of $892,927. When The Gap was unwilling to renew at that rate, the Debtor and The Gap entered into an amendment to extend the lease for three years to March 31, 2028. Under the lease as amended, the rent was substantially reduced, commencing at a rate of $400,000. However, the amendment included a provision that permits the Debtor to terminate the lease on six months' notice. As of April 2026, the rent under The Gap lease was $410,000, with a 2.5% yearly escalation.

On March 31, 2022, the Debtor signed a promissory note with the Lender to borrow $15,000,000, secured by a mortgage on the Property and a related assignment of leases and rents. The maturity date of the note was March 31, 2025, and the Debtor failed to pay the loan when it came due. As of April 14, 2026, the Lender asserts that it is owed in excess of $15,000,000, including principal, interest, late charges, and legal fees. The Debtor admits that the Lender is owed principal in the amount of $13,979,253.19, but disputes the calculation of interest and the assessment of late charges and legal fees.

On February 26, 2026, the Lender filed the Motion, which was opposed by the Debtor. After preliminary hearings, the Court bifurcated the issues to address first the issue of valuation of the Property.

The Court held an evidentiary hearing on May 7, 2026, limited to the issue of valuation of the Property for purposes of the Motion and for a plan of reorganization. The parties agreed upon the submission of six exhibits. Four of the exhibits were appraisals and the remaining two exhibits were loan statements by the Bank.

The four appraisals admitted as exhibits were:

a. An appraisal dated April 15, 2026, by BBG, Inc. ("Wood Appraisal") prepared for the Debtor. The appraisal was performed by Matthew Wood, Senior Managing

Director and Owen Nally, Senior Appraiser. The Wood Appraisal valued the Property as of April 2, 2026, at $15,700,000 for a market value, as is.

b. An appraisal dated April 16, 2026, by Cushman & Wakefield Regional, LLC, ("Segien Appraisal") prepared for the Lender. The appraisal was performed by Craig Segien, Executive Director. The Segien Appraisal valued the Property as of April 9, 2026, (i) at $13,400,000, for a market value, as is; and (ii) at $8,700,000, for an orderly liquidation value.

c. An appraisal dated March 3, 2025, by Cushman & Wakefield Regional, LLC, ("Sargeant Appraisal") prepared for the Lender. The appraisal was performed by Stefan Sargeant, Managing Director, and McLane Hill, Associate Director. The Sargeant Appraisal valued the Property premised on a proposal of the Debtor to convert two floors of the commercial space to residential units. The Sargeant Appraisal valued the Property (i) as of February 19, 2025, at $14,400,000, for a market value, as is, premised on the proposed conversion; and (ii) as of September 1, 2026, at $17,800,000, upon completion of the conversion. The Sargeant Appraisal also valued the Property at $13,700,000, for a market value, as is, assuming no conversion of the retail space.

d. An appraisal dated January 22, 2022, by CBRE, Inc. ("CBRE Appraisal") prepared for the Lender in connection with the loan. The appraisal was performed by James Moore, Executive Vice President; John Charters, Executive Vice President; and Harris Collins, Executive Vice President. The CBRE Appraisal valued the Property as of January 4, 2022, at $23,300,000 for a market value, as is. As reflected above, when the CBRE Appraisal was undertaken, The Gap lease

was for a ten-year term with potential renewals.

Two witnesses testified at the evidentiary hearing: Craig Segien for the Lender and Matthew Wood for the Debtor. The Court accepted the respective appraisals as the direct testimony of each witness, with each witness subject to cross-examination. Except for the Exhibits and the testimony of the witnesses, no other evidence was presented.

The principal evidence presented at the evidentiary hearing included the following:

**1. Segien testimony and Segien Appraisal**

The following is a summary of Segien's testimony, including the Segien Appraisal, accepted as the direct testimony of Segien, and Segien's testimony at trial. Segien determined that the market value of the Property as of April 9, 2026, was $13,400,000, and the orderly liquidation value was $8,700,000 as of such date. He employed two different methodologies: the sales comparison approach and the income capitalization approach. His final value gave the most weight to the income capitalization approach, concluding that it was typically used by purchasers of this type of property. For purposes of his valuation, Segien considered the Property to be 18,951 square feet consisting of 9,315 square feet of residential space and 9,636 square feet of commercial space based on The Gap lease. Segien concluded that the lease, which was a signed legal document, was more reliable than the owner's summary of 10,525 square feet for commercial space.

To begin the sales comparison approach, Segien analyzed five Boston-area mixed used properties sold between September 2023 and February 2026. Although Segien included a sale from September 2023 in Back Bay, he did not include the sale of a property at 37-43 Temple Place ("Temple Place Property") that occurred in September 2023. Beginning with the sale price per square foot, Segien then adjusted the price per square foot for each building to account for

differences in timing and differences from the Property. His analysis included separate adjustments for timing; location; size; age, quality, and condition; amenities; and utilities. He also included two additional adjustments: one for economics, such as the requirement for inclusion of affordable units, and one for "other factors", such as the requirement for association dues. In comparing the Property to the other buildings, Segien also took into account differences in the net operating income per square foot for the properties. For these purposes, Segien used the estimated net operating income of the Property of $42.22 per square foot that he determined in the income capitalization approach discussed below. The Segien Appraisal included an addendum with detailed sale sheets for each of the properties used in the comparison, which provided additional details on the sale and the amenities for the particular property.

Applying the foregoing adjustments, Segien calculated a blended value of $750 per square foot for the Property. Based on 18,951 square feet, this resulted in a baseline value of approximately $14,213,250. Segien then applied an adjustment because of The Gap lease, which was below market, and the cost of reletting the property. Segien calculated the adjustment as $1,163,258, considering the effective rent loss over the remaining term of two years, leasing commissions, tenant improvements for new or renewing tenants, and an entrepreneurial incentive of 15%. Following this deduction, after rounding, Segien arrived at a final value of $13,000,000 using the sales comparison approach.

For the income capitalization approach, value of the Property is determined based on the potential net operating income of the Property divided by an appropriate capitalization rate. To determine the value, Segien first determined the revenues and expenses of the Property as stabilized, applied an appropriate adjustment for expenses to stabilize, then determined the appropriate capitalization rate.

Segien determined the appropriate potential revenue of the Property by analyzing the commercial and residential components of the Property separately. To determine the appropriate market rent for the retail area, Segien analyzed eight comparable retail rents for properties either actively listed or leased in the Boston area. Four of the properties were either active listings in April 2026 or leases commencing in 2026. The other four properties were for leases commencing from September 2023 through September 2025. Among the leases that Segien considered was the lease of 399 Washington Street, Boston, which is adjacent to the Property. Segien included the lease at 399 Washington Street by a company known as Uniqlo at $38.00 per square foot, based on his conversations with a broker in his office who had spoken to the broker involved with the lease. The lease commenced in April 2026.

For each of the retail rent comparables, Segien included information on the lease date, leased space, initial rent, tenant improvements, free rent, and comments that provided additionally information regarding the property, the tenant improvements, or the amenities. Unlike the sales comparisons, Segien did not do specific adjustments for each retail rental comparable, but instead considered the various factors in reaching a conclusion on an appropriate market retail rent for the Property. Based on his consideration of the comparable leases and conversations with brokers in the market, Segien determined specific rents for each floor of retail space and a blended rate for the entire retail space. Segien concluded that an appropriate rent for the retail space was $100.00 per square foot for the first floor and $30.00 per square foot for the basement, second floor and third floor. Applying the foregoing to the 9,636 of commercial space, Segien concluded that the market rent for such space would be an annual rent of $438,880, or a blended rate of $45.55 per square foot.

For the residential space, Segien considered the rent for similar apartments in comparable

properties in Boston by unit type, identifying each by the property location. After considering the other market rates, Segien determined a market rent for the units by type, for an aggregate market rent of $586,200 for the residential space.

As part of his analysis of income, Segien also considered recoveries from commercial tenants as well as potential vacancy and collection losses. Commercial tenants typically enter into a net lease, which requires the tenant to pay a pro rata share of real estate taxes and certain common area and operational expenses. Segien estimated commercial recoveries of $143,800, comprised of the commercial real estate taxes of $95,620 and contribution for common area and maintenance expenses of $48,180, based on $5.00 per square foot. Based on market expectations, Segien adjusted the commercial and residential income with a 5% deduction for vacancy and collection loss. Segien also included a small component for miscellaneous revenue, such as laundry revenue, utilizing the Debtor's historical financials.

Combining the foregoing components of income, Segien calculated an Effective Gross Revenue of $1,120,375 upon stabilization. He next forecast the operating expenses and taxes, based on the historical expenses of the Property, as well as operating expenses from comparable properties. Based on the foregoing, Segien forecast the total expenses at $320,277, including real estate taxes of $180,414 and operating expenses of $139,863. After deducting expenses, Segien determined the projected net operating income at $800,098, or $42.22 per square foot based on 18,950 square feet.

To arrive at a value for the Property under this method, Segien next considered the appropriate capitalization rate. Segien considered capitalization rates for both residential properties and commercial properties from comparable property sales, national surveys, and market participant surveys. For residential properties, the rates ranged from 4.75% to 5.72%. For

commercial properties, the rates ranged from 6.00% to 6.57%. Segien concluded that 5.5% was an appropriate blended capitalization rate, combining equally a 5% rate for residential properties and a 6% rate for commercial properties.

After applying the capitalization rate to the net operating income, Segien determined the preliminary value of the Property was $14,500,000, or $765.00 per square foot. As with the sale comparison approach, Segien also adjusted the value by $1,163,258, to account for the costs of reletting the commercial space to achieve a market rate. Based on the foregoing, Segien concluded the value of the Property was $13,400,000 using the income capitalization method. In his final conclusions, he gave the most weight to the income capitalization value, considering this to be the method typically used by potential buyers.

Segien also determined a liquidation value of $8,700,000, for the sale of the Property in a shortened time frame of three months. To determine the value, he discussed an appropriate discount with two capital markets brokers, who considered the specific Property, including the issues of The Gap lease. The brokers suggested a potential range of a 20-50% deduction from the market value, but noted that the rate is difficult to project depending on the asset and the lender. Segien concluded that an appropriate rate was 35%, applying it to the $13,400,000 valuation under the income capitalization rate.

**2. Wood testimony and Wood Appraisal**

The following is a summary of the Wood's testimony, including the Wood Appraisal, accepted as the direct testimony of Wood, and Wood's testimony at trial. Wood determined that the market value of the Property as of April 2, 2026, was $15,700,000, considering both the sales comparison approach and the income capitalization approach. Similar to Segien, Wood gave the most weight to the income capitalization approach value. He did not determine a liquidation

value.

For purposes of his valuation, Wood determined the Property to be 19,840 square feet, consisting of 9,315 square feet of residential and 10,525 square feet of commercial space. Wood could not explain why he used the 10,525 square feet for the commercial space, or why there was a discrepancy from The Gap lease of 9,636 square feet.

For the sales comparison approach, Wood analyzed seven Boston area buildings sold between September 2023 and October 2025. He included the Temple Place Property sold in September 2023, and testified that he considered that property the most comparable to the Property. After calculating the sale price for the buildings, Wood adjusted the sales price for timing, location, property size, and age, condition, and quality. He also included a single adjustment for "economics/tenancy" to adjust for different efficiencies in a property or higher rental levels. The economics adjustment appeared to be primarily a comparison to the estimated net operating income of $54.51 per square feet determined by Wood as part of his income capitalization valuation. Although his summary included additional comments in the chart, he did not include detailed sales sheets for each property.

Based on the sales comparisons, Wood concluded the stabilized value of the Property under this method was $17,100,000, calculated at $860.00 per square foot using 19,840 square feet for the Property. To determine the "as is" market valued Wood then applied a lease-up adjustment in the amount of $1,600,000 to allow for an 18-month period to market and re-let the commercial space. The adjustment included anticipated rent loss, retail tenant improvements, lost reimbursement revenue, leasing commissions, and entrepreneurial incentive. After reflecting the adjustment, Wood concluded that the Property had value of $15,500,000, using the sales comparison approach.

Wood also analyzed the Property using the income capitalization approach. For the commercial space, Wood considered the best use of the commercial space would be retail space for the ground floor and basement space, with the second and third floor most likely used for office space. For the ground floor retail area, Wood analyzed eight comparable leases commencing between February 2021 and January 2026. His analysis chart included information on the lease date, leased space, and initial rent. Wood also included a summary chart reflecting his review of seven local leases for office space, with leases commencing between February 2024 and December 2026, reflecting similar information. Neither of the charts included specifics on tenant improvements or additional comments on each property. While he did not include specific information on tenant improvements, Wood noted that tenant improvement allowances up to $70.00 per square feet would be reasonable for office space. Wood did not make specific adjustments for each property, but used the range to estimate market rate rent.

Wood did not include the Uniqlo lease in his analysis, nor did he include any leased spaces that were being offered in 2026. Although he did not include the Uniqlo lease, he testified that the Uniqlo lease had a rate of $56.00 per square foot based on his conversation with the broker handling the lease.

Based on the market rents, Wood concluded that the appropriate rent for the commercial space was $165.00 per square foot for the ground floor, $50.00 per square foot for the basement, and $35.00 per square foot for the second and third floor. Applying these values, Wood concluded that the commercial rent at market value would aggregate $723,955, or $68.79 per square foot for 10,525 square feet.

For the residential properties, Wood also did a review of comparable Boston properties by unit type. Properties were identified on a map, and some, but not all, properties were

identified by property address. After considering the market comparisons for each unit type, Wood concluded the appropriate market rate for the residential units was $591,000.

Wood also considered both commercial recoveries and vacancy loss for the Property in determining the income. After pro rating recoverable taxes and operating expenses, Wood estimated a value of $171,981 for commercial recoveries. He also applied a 5% adjustment for vacancy and collection loss.

Combining the income elements, Wood forecast an Effect Gross Income of $1,412,589. He estimated expenses of $331,134, including projected taxes of $197,493. Based on the foregoing Wood calculated that net operating income as $1,081,455, resulting in $54.51 per square foot based on 19,840 square feet.

Wood concluded that the appropriate capitalization rate was 6.25%. He considered the rage of 4.57% to 6.57% for the capitalization rate for the comparable sale properties. In addition, he considered investor surveys, ranging from 4.25% to 9.00 % placing greater weight on the market extraction data.

Applying the 6.25% capitalization rate to the net operating income, Wood concluded that the Property had an indicated stabilized value of $17,300,000. After deducting lease-up adjustments, Wood concluded the value of the Property was $15,700,000 using the income capitalization method.

**3. The Sargeant Appraisal**

Although none of the authors of the Sargeant Appraisal testified, the Sargeant Appraisal was submitted as an agreed exhibit and was referenced both in the testimony and in the closing arguments. However, the Sargeant Appraisal was based on a proposal which would convert two of the commercial floors to residential floors, a considerably different premise from the current

or projected use of the Property. The Sargeant Appraisal also included a valuation "as is" without any conversion. Given the premise of the Sargeant Appraisal, only certain aspects of the Sargeant Appraisal were of assistance in the current valuation.

Similar to the other appraisals, the Sargeant Appraisal begins with a sale comparison valuation. For this purpose, the appraiser only relied on two properties that were multiuse, including both residential and commercial space. The remaining properties were either only residential or only commercial. As such, the Court concluded that the sale comparison valuation was of limited assistance.

Using the income capitalization approach, the appraiser derived a value of the Property as converted and a value "as is" without conversion. For the commercial space, the appraiser considered recent rental comparables across Boston, as well as current rents at certain locations. The appraiser concluded that the appropriate market rate for the commercial space was $165.00 per square foot for the ground floor and $40.00 per square foot for the basement. For the "as is" analysis, the appraiser concluded that the commercial rent would be $686,500, including a market rate of $40.00 per square foot for the second and third floor. Based on comparison to comparable properties by residential unit type, the appraiser concluded that the residential rental income without conversion would be $591,000. After deducting a reserve for vacancy loss, operating expenses, and taxes, the appraiser concluded that the net operating income would be $940,972 for the Property assuming no conversion of two floors of the retail space to residential units.

The appraiser reviewed applicable capitalization rates and determined that the appropriate capitalization rate for the "as is" analysis was 6.25%. Applying the rate, the appraiser reached a preliminary value of $15,100,000. However, he concluded that adjustment was required for the

ongoing lost rent due to the below market rent of The Gap, as well as leasing commissions and entrepreneurial incentive. His conclusion was that the Property, without any conversion, had a value of $13,700,000.

**APPLICABLE LAW**

As reflected above, the Court considered the issue of valuation of the Property for purposes of the Motion as well as for a reorganization plan. Under Section 506 of the Code, a secured claim is based on the value of the collateral. The value is determined "in light of the purpose of the valuation and of the proposed use or disposition" of the Property. 11 U.S.C. § 506(a). In the context of a motion for relief from stay, typically liquidation value is the appropriate measure. *See In re Gould*, 348 B.R. 78, 80 (Bankr. D. Mass. 2006). The burden of proof on the issue of equity in the Property for purposes of the Motion rests with the Lender. 11 U.S.C. § 362(g)(1). For purposes of a plan of reorganization, where the Debtor proposes to retain the Property, fair market value is an appropriate measure. *In re Winthrop Old Farm Nurseries, Inc.,* 50 F.3d 72, 75 (1st Cir. 1995). Accordingly, the Court has considered both fair market value and liquidation value.

**ANALYSIS**

Having considered the evidence, including the appraisals and the testimony, as more fully detailed below, the Court finds that the fair market value of the Property is $13,300,000 and the liquidation value of the Property is $10,000,000 as of the date of this opinion. The Court considered the Segien testimony, the Wood testimony, and the Sargeant Appraisal, as well as its own experience in dealing with valuation. As detailed below, the Court applied both the sales comparison approach and the income capitalization approach to determine the appropriate values. As the appraisers did, the Court placed greater weight on the income capitalization value

as most closely reflecting the measure considered by a potential purchaser.

**1. Income Capitalization Value**

The Court first considered the income capitalization value, since aspects of the analysis affect the sale comparison valuations. Each of the appraisers valued the Property as if it were producing market rent rather than the current below-market rent and short-term lease of The Gap. Therefore, the appraisers made adjustments to comparable sales based on the projected net operating income calculated in the income capitalization valuation, not based on the Debtor's actual net operating income. In addition, the appraisers made other adjustments, such as lost rent, based on what they calculated as market rent.

The Court determines the revenue based on market rent, separately considering the residential space and the commercial space as the appraisers did. For the residential space, the Court finds that the projected aggregate rent of $586,200 in the Segien Appraisal is appropriate. Segien based the rent on the Property as currently structured and for comparable identified properties. While Wood calculated an aggregate rent that only differed by $5,000, the Court declined to consider the residential rents provided by Wood since the Court had concerns about the method and some inconsistencies. First, although he provided a map, Wood declined to identify all of the residential properties by street number and name, instead listing them as "Mixed Use Property." One of the properties listed only as "Mixed Use Property" was the Temple Place Property, which Wood used as a comparison for three types of units. This was determined not from the Wood listings, but from the map and the Segien Appraisal, which also used the property for comparison on one unit type. In each case, the comparable size units had lower rent. Despite touting the Temple Place Property as the most comparable property in the sale comparison, Wood concluded that the rents for the Property should be higher than those at

Temple Place Property. No explanation was given for this incongruity, or the deliberate omission of the street address. In addition, although Wood included different properties, he adopted precisely the same rental rate for each unit that was provided in Sargeant Appraisal. For example, he too selected $3,450 for the one-bedroom unit, $4,050 for the two-bedroom units, $5,050 for the three-bedroom units, and $7,250 for the four-bedroom units. But the Sargeant Appraisal not only covered a different time frame, it also was premised on new units being included in the mix, which presumably would yield higher rentals.

The Court finds that the projected commercial rent is $489,000. The calculation is based on $40.00 per square foot for the basement, $100.00 per square foot for the main retail floor, and $35.00 per square foot for each of the second and third floor. To calculate the commercial rent income, the Court finds that the commercial space is 9,636 square feet, allocated as provided in the Segien Appraisal. As Segien did, the Court relies on The Gap lease amendment, which was included in the Segien Appraisal. The Court rejected the analysis provided by Wood, since he was unable to identify the source of the figure of 10,525 square feet that he used.

To determine the market rent, the Court considered the retail rent comparables in the Segien Appraisal from 2024, 2025, and 2026, adjusting the Uniqlo Lease to $56.00 per square foot and excluding the rent comparable listed as #5 at 500 Commonwealth Avenue. The Court also considered the retail rent comparables from the Wood Appraisal from 2024, 2025 and 2026, excluding the lease listed at #3, the Apple Store at 815 Commonwealth Avenue. Because there were no specific adjustments, the Court excluded the leases earlier than 2023 as not comparable to the current market. The Court excluded the Apple store lease because of the difficulty in determining the effective rate and the location. As noted in the Sargeant Appraisal, the Apple lease includes over $4,000,000 in tenant improvements. Wood failed to note the improvements in

his appraisal and its effect on the rent. As stated in the Wood Appraisal, owners amortize the cost of tenant improvements through higher contract rents. In addition, the Apple store was located in a significantly different area, opposite the Prudential Center shopping plaza and the most expensive residential condominiums in the city. The Court also excluded the lease at 500 Commonwealth Avenue in the Segien Appraisal because of difficulty in determining the effective rent. As the comments noted, the lease contemplated a significant overage payment of $100,000 each year, which may have resulted in a lower contract rent. Finally, as stated above, the Court adjusted the Uniqlo lease to $56.00 per square foot based on Wood's testimony that he spoke directly with the broker involved with the transaction.

Considering the foregoing range of rent comparables, the Court placed greater weight on the most recent offerings and the Uniqlo lease considered in the Segien Appraisal. Having considered the foregoing leases, the Court finds that the appropriate rate for the main retail space is $100.00 per square foot. The Court finds that the value of $40,00 per square foot for the basement in the Sargeant Appraisal was well supported. Finally, the Court finds that the rate of $35.00 per square foot for the second and third floor as utilized in the Wood Appraisal is appropriate. Wood noted that the rate is based on comparable office spaces and adjusted for expense reimbursements.

Finally, the Court also considered the blended rate for the commercial space in comparison to recent offerings. While the Uniqlo space involved a larger space, the configuration of the Debtor's space, spread across four floors, is more cumbersome for a single retail tenant. In addition, however, the configuration of the space may change, with a new retail tenant occupying only the first floor and basement, and the second and third floor occupied by one or more office tenants. The foregoing values take such potential configurations into account.

The Court also considered income recoveries from the commercial tenants based on projected operating expenses and real estate taxes. The Court finds that total projected expenses are $330,000. This is based on the operating expenses of $140,000 as reflected in the Segien Appraisal, which the Court finds is an appropriate measure. The determination in the Segien Appraisal was based on the historical expenses of the Debtor, with adjustments to general, administrative, and marketing expenses based on the market. The Wood Appraisal did not consider the marketing and general expenses. The Court also finds the current real estate taxes of $180,000 relied on in the Segien Appraisal to be the appropriate measure. In his analysis, Wood used a higher tax amount, assuming an investor would attempt to capture a potential increase due to a sale. The Court declines to use Wood's tax amount since there is uncertainty as to the adjustment, including the amount of the revaluation, the likelihood the potential investor would seek to recoup some portion, and the amount the investor would seek to recoup.

Based on the foregoing operating expenses and taxes, the Court finds that income would include reimbursement of $157,000 from the commercial tenants. Because the full lease terms were not in evidence, the Court determines that allocating expenses by square-footage percentage is the most reasonable method. The Court accordingly determines that 51% of the expenses and taxes were recoverable, based on the percentage of the commercial space of 9,636, to the total space of 18,951. Although the Debtor historically experienced little vacancy, all three appraisers agreed that a vacancy and collection deduction was appropriate. Accordingly, the Court finds that a deduction of 5% of rental income for vacancy and collection costs is appropriate.

Considering the foregoing findings, the Court finds that the projected net operating income of the Property is $850,000, or $44.80 per square foot. The net operating income is

calculated as follows:

| | | | |
|---|---|---|---|
| **Revenue** | | | |
| | Residential | $586,000.00 | |
| | Commercial | $489,000.00 | |
| | Recoveries and Other | $157,000.00 | |
| | | | |
| **Potential Gross Revenue** | | | **$1,232,000.00** |
| | Less Collection & Vacancy | $62,000.00 | |
| | | | |
| **Effective Gross Revenue** | | | **$1,170,000.00** |
| | Operating Expenses | $140,000.00 | |
| | Taxes | $180,000.00 | |
| **Total Expenses** | | | **$320,000.00** |
| | | | |
| **Net Operating Income** | | | **$850,000.00** |

Having considered the capitalization rate ranges and the rates utilized by Segien and Wood, the Court finds that a 6% capitalization rate is appropriate. Both appraisers provided information on rates ranging from 4.75% to 6.78% for comparable sales and local market inquiries. They also included national data with a broader range for 4.25% to 9.00%. The residential capitalization rates were at the lower end of the spectrum averaging 5% to 5.25%, with commercial properties at the higher end of the spectrum, 6% to 6.78%. The Property has a steady residential rent revenue, but an uncertain commercial rent revenue, given the short-term and below market lease with The Gap. Accordingly, the Court considered 6% to be an appropriate rate, blending a lower rate for the residential space with a higher rate for the commercial space. Applying a 6% cap rate to the $850,000 net operating income, the Court finds a preliminary value of $14,200,000, before further adjustments.

From the preliminary value, the Court finds that an adjustment of $900,000, is appropriate to account for stabilizing the Property to market rentals. The adjustment includes

$158,000 for the loss of market rent on the commercial space for two years, $147,000 for leasing commissions, $482,000 for tenant improvements or concessions, and $118,000 for an entrepreneurial incentive. Both Segien and Wood considered an adjustment appropriate, but each used different assumptions. Wood used an 18-month window, to account for marketing the commercial space, providing the six months' notice to The Gap, and making necessary improvements for new or continuing tenants. Segien used a two-year period, consistent with the remainder of The Gap lease. After considering both approaches, the Court concluded that a two-year period is appropriate. While the remainder of The Gap lease is shorter as of the date of this opinion, since the Court has relied on evidence as of April 2026, the Court concludes that the two-year period remains appropriate.

The adjustment also includes leasing commissions at a rate of 6%. Both Wood and Segien agreed that a leasing commission of 6% would be required for new commercial leases. They differed as to the lease term for the commercial leases. Wood calculated the commissions based on leases with a five-year term while Segien used a ten-year term. In reviewing the commercial rent comparables, the range of lease terms for the retail leases was longer, ten to fifteen years, while the office leases often ran for shorter terms of three to five years. Since the Property may be re-let to different types of tenants, the Court concluded that a five-year term was appropriate to use for determining potential lease commissions.

The Court also included an adjustment for tenant-improvement allowances of $482,000 based on $50 per square foot of the commercial space of 9,636 square feet. A new tenant would likely expect a tenant improvement allowance or rent concessions. Neither appraisal explained this factor well. Segien used $75.00 per square foot for each floor; Wood used $50.00 per square foot for the main floor, $25.00 per square foot for the upper office floors, and no adjustment for

the basement. The rent comparables included a wide range of tenant improvement allowances, from $0 to as high as $4,000,000 for the Apple Store lease. Wood noted that an improvement allowance of $70.00 per square foot would not be unreasonable for office space. Given this range, the Court concludes that $50.00 per square foot is appropriate, reflecting the likely need for significant improvements, especially if the space is divided among multiple tenants. The Court notes that the existing tenant has been in place since 2014 and received no improvement allowance upon renewal in 2025, making substantial upgrades more likely to be required.

Based on the foregoing findings, the Court finds a final valuation of $13,300,000 for the Property using the income capitalization approach. The value is summarized as follows:

| | |
|---|---:|
| **Net Operating Income** | **$850,000.00** |
| | |
| **Preliminary value (applying cap rate of 6.00%)** | **$14,166,666.67** |
| | |
| **Rounded** | **$14,200,000.00** |
| | |
| **Less Adjustments** | **$900,000.00** |
| | |
| **Value Using Income Capitalization Method** | **$13,300,000.00** |

**2. Sales Comparison Approach**

The Court also considered the sales comparison approach to determine value. Based on the comparable sales discussed below, the Court finds that the preliminary value would be $14,400,000, based on a market price of $760.00 per square foot for the 18,951 square feet of the building. Similar to the income capitalization valuation, the Court adjusts the foregoing by $900,000, to conclude a fair market value of $13,500,000.

In determining the appropriate sale price, the Court considered the comparable sales in both the Segien Appraisal and the Wood Appraisal, with some adjustments. The Court also

considered the Cambridge Street Apartment from the Sargeant Appraisal, with an adjustment. For the Wood Appraisal, the Court revised the economic adjustment. Wood's analysis did not include detailed sales sheets or more explanation as to why particular adjustments were made. The economic adjustment was primarily based on a comparison of the particular property's net operating income to the net operating income calculated by Wood of $54.51 per square foot. Since the Court determined that the applicable net operating income was $44.80 per square foot, the Court adjusted this variance accordingly for the properties in the Wood Appraisal.

All three appraisers used the TToren Flats property in Allston as a comparable Property. The Court concludes that the analysis by Segien is the appropriate value, subject to an adjustment for the inferior location.

After applying the Court's adjustments across the selected comparables, the adjusted per-square-foot range was $678.00 to $876.00. The average of the adjusted values for the 12 properties was $762.00 per square foot, with the median at $757.00 per square foot. Given the foregoing, the Court finds that $760.00 per square foot is appropriate for the comparison.

**3. Liquidation Value**

Finally, the Court finds that the liquidation value of the Property is $10,000,000. The only evidence presented was by Segien, who concluded an appropriate value would be a reduction of 35% of the fair market value. Based on its own experience, the adjustments already made, and the characteristics of the Property, the Court finds that 25% is an appropriate discount The Court applies the discount to the value of $13,300,000, determined under the income capitalization approach to reach the $10,000,000 value at liquidation.

**CONCLUSION**

Having considered the foregoing findings, the Court finds that the value of $13,300,000 determined under the income capitalization approach is the appropriate fair market value of the Property. The Court also finds that the Property has a liquidation value of $10,000,000. Since the evidentiary hearing was limited to the issue of value, by separate order, the Court has scheduled a further hearing to consider the remaining issues for the Motion and with respect to the reorganization plan.

Dated: September 23, 2026

By the Court,

Janet E. Bostwick
United States Bankruptcy Judge